# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

CONTINENTAL INSURANCE )
COMPANY, TRANSCONTINENTAL )
INSURANCE COMPANY, and )
TRANSPORTATION INSURANCE )
COMPANY, )
)
      Plaintiffs, Counter-Defendants, )
)
vs. )     **Case number 4:04cv0254 TCM**
)
SHAPIRO SALES COMPANY, )
)
      Defendant, Counter-Claimant. )

## <u>MEMORANDUM AND ORDER</u>

This insurance dispute is before the Court[1] on the following motions: the motion of plaintiff Transcontinental Insurance Company ("Transcontinental") for partial summary judgment [Doc. 42]; the motion of plaintiff Continental Insurance Company ("Continental") for partial summary judgment [Doc. 44]; the motion of Continental and Transcontinental to strike [Doc. 53]; the motion of defendant Shapiro Sales Company ("Shapiro") to exclude the opinion of Plaintiffs' expert witness [Doc. 60]; the motion of plaintiff Transportation Insurance Company ("Transportation") for summary judgment [Doc. 77]; the cross-motion of Shapiro for summary judgment on Counts I and II of its amended counterclaims [Doc. 81]; the motion of Transportation to strike [Doc. 86]; the motions of Transportation for summary judgment and for a hearing [Docs. 91, 92]; the motion of Transcontinental for

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. <u>See</u> 28 U.S.C. § 636(c).

summary judgment [Doc. 100]; and the motion of Continental for summary judgment [Doc. 101].

## Background

This dispute has its genesis in two other pieces of litigation. One was filed in the Circuit Court of Miller County for the State of Arkansas. (Doc. 42[2] Ex. E.) The fourth amended complaint in the case Wise et al. v. Arkansas Aluminum Alloys, Inc., No. CIV-2001-21-1 (the "Wise suit"), was filed on behalf of 15 plaintiffs against 16 named corporations and 10 "John Does." (Id.) Shapiro was one of 12 named corporations referred to as a "Contract Employer Defendant." (Id. ¶ 2.) These defendants and the "John Doe" defendants allegedly knew that the method employed by Red River Aluminum ("RRA"), a business once located near Stamps, Arkansas, to process their aluminum dross[3] or scrap material created large amounts of salt cake, labeled as a "waste pollutant" by the plaintiffs. (Id. ¶¶ 2, 3.) The problem created by this pollution was described in the first numbered paragraph as "massive and inexcusable." (Id. ¶ 1.) The plaintiffs further alleged that the Contract Employers knew that this salt cake would "cause severe damage to the environment and to adjacent properties" if it was not confined and disposed of properly. (Id. ¶ 4.) Shapiro, a Missouri corporation in the business of buying and selling different types of scrap metal, including aluminum, and the other Contract Employers continued to hire RRA to

---

[2]The parties have filed 35 pleadings in connection with the 11 pending motions. For ease of reference, the Court will cite to the docket number when citing a pleading.

[3]"Dross" is defined in the complaint as the residue that remains after aluminum is heated. (Id. ¶ 49.) The parties agree that "[d]ross is a generic word for scrap and is a form of scrap." (Doc. 78 no. 7.)

process their materials although they allegedly knew that RRA was illegally dumping the salt cake, causing damage to the vegetation on plaintiffs' nearby properties, contamination to their groundwater, and irritating and unhealthy pollution to their air. (Id. ¶ 6; Doc. 78 no. 5.) Specifically, each of the Contract Employers was liable for the following conduct:

> [Name of Contract Employer] was aware of the processes utilized by RRA and Ferguson [the president of RRA] to handle and process their material. [Contract Employer] knew that the process utilized by RRA and Ferguson produced a significant amount of salt cake. [Contract Employer] knew that if RRA did not properly and carefully dispose of the salt cake, there was a grave risk of serious harm to surrounding property owners and the environment. [Contract Employer] knew or should have known that RRA and Ferguson were not properly handling the salt cake being generated by the processing and handling of its material, and that RRA and Ferguson lacked the requisite skill and resources to do so. [Contract Employer] knew, or should have known, that RRA had not obtained the proper permits to dispose of the salt cake in the manner that it did. [Contract Employer] knew, or should have known, that pollutants associated with the processing of its material were escaping into the environment, including surface waters, groundwater and neighboring properties.

(Doc. 42 Ex. E ¶¶ 18, 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44, 46.) At the end of RRA's existence, in November 1998, there were 80,000 cubic yards of salt cake waste over 8.8 acres of land. (Id. ¶¶ 7, 67.) In addition to seeking compensation for their injuries and damages under theories of trespass, nuisance, and negligence, the plaintiffs sought a mandate under common law and the Arkansas Solid Waste Management Act requiring all defendants to clean up the "mess" left by RRA. (Id. ¶ 8.) The RRA facility was later designated as a superfund site under the Comprehensive Environmental Responsibility, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-75. (Id. ¶ 68.)

Shapiro was served with the fourth amended complaint in the Wise suit on May 10, 2002.  (Doc. 91 no. 165.[4])  On July 10, Shapiro was served with the fourth amended complaint in <u>Clark v. Arkansas Aluminum Alloys</u>, No. CIV2002-51-2 (the "Clark suit").  (<u>Id.</u> no. 166.)

This litigation was filed in the Circuit Court of Lafayette County in the State of Arkansas and was filed on behalf of 372 current and former residents of Stamps and former employees of RRA against 20 corporations, including Shapiro.  (Doc. 42 Ex. F.)  The plaintiffs alleged they "suffered numerous and sundry physical ailments of unknown origin" as a result of RRA's operations.  (<u>Id.</u> ¶ V.)  These operations caused hazardous toxins to be released into the environment.  (<u>Id.</u> ¶ VI.)  Specifically, Shapiro and the other defendants allegedly "well knew of the dangerous propensities of aluminum dross and scrap and well knew that if aluminum dross and scrap were not properly, carefully and skillfully handled, that toxic metals and other toxic substances would be released from the secondary smelting of the aluminum dross and scrap."  (<u>Id.</u>)  It is further alleged that the defendants delivered their "hazardous" aluminum dross to RRA although they knew that RRA had been cited on numerous occasions for failing to comply with applicable laws and regulations on the disposal of hazardous materials.  (<u>Id.</u> ¶ VII.)

The environmental problems at RRA cited in the Wise and Clark suits were noticed at least by May 1990.  (Doc. 91 Ex. R.)  That month, W.C. Ferguson, Jr., the president of RRA, wrote a customer about the efforts RRA was making to properly melt the 86 truck-

---

[4]This document is Transportation's Statement of Uncontroverted Material Facts.  When citing a party's statement of uncontroverted material facts, the Court will cite only those factual allegations that are admitted by the opposing party.

loads of aluminum dross received from that customer. (Id.) Ferguson wrote that the construction of a furnace for that purpose had been delayed by the requirements of the Environmental Protection Agency ("EPA"). (Id.)

The next year, M.S. Scrock wrote Ferguson on behalf of the Aluminum Company of America ("Alcoa") to inquire about RRA's "commitment to the environment." (Id. Ex. S.) Scrock inquired about RRA's "methods for handling and disposal of saltcake and other residues" from the processing of aluminum scrap. (Id.) Ferguson replied, explaining how RRA planned to dispose of the salt cake in the future. (Id. Ex. T.) His plan was to "grind[] it [the salt cake], put[] it through water so as to take out the salt, potash, and all other substances which are water-soluble, removeing [sic] the metals in the resulting brine, and then pumping the brine down a disposal well into a geological formation which was originally oil-bearing but now depleted." (Id.) RRA was moving as fast as it could to implement this disposal plan and was temporarily storing the salt cake on its property. (Id.) Ferguson further explained that landfills and salt reclamation were expensive. (Id.) He requested Alcoa's help in applying for financing, asking that Alcoa "indicate its approval of this system as being a satisfactory means of dealing with all environmental problems connected with salt cake." (Id.)

Two months later, in November 1991, the temporary storage was described by a visitor from the engineering department at Alumax, Inc., as being on bare ground "completely exposed to the weather." (Id. Ex. V.) RRA was reported to then have an excess of 50 million pounds of salt cake stored on site. (Id.) The visitor further reported that Ferguson had informed him that the anticipated startup for his disposal plan was in March

1992.  (Id.)  In January 1992, that same visitor met again with Ferguson.  (Id. Ex. Y.)  He reported in an inter-office memorandum that Ferguson had informed him that RRA had a permit to operate a saltwater injection well, but the well had yet to be drilled due to weather and other logistical problems.  (Id.)  Ferguson was "hoping for a spring startup of the system" and anticipated that the stockpile of salt cake would then be processed in 9 to 10 months.  (Id.)

Ferguson's hopes were not realized that spring.  In April, he and the Arkansas Department of Pollution Control and Ecology ("ADPCE") entered into a Consent Administrative Order requiring RRA to submit within 30 days a plan for the completion of the well, including construction and testing schedules.  (Id. Ex. H.)  This Order noted that RRA was utilizing two existing runoff storage ponds on either end of its stockpile of salt cake to contain runoff from that stockpile.  (Id.)  It also included a finding of fact that "known to be occurring on January 21, 1992, RRA, in the operation of the above-described wastewater disposal system, allowed a discharge of wastewater from both storage ponds, in such a manner and at such a rate as to place or cause to be placed such wastes in a location where they are likely to cause pollution of the waters of the state."  (Id.)

A September 1992 letter to Ferguson from Gerald Delavan, a senior geologist with the ADPCE, noted that a report issued by its Water Division had "indicate[d] there [was] considerable chloride contamination in the ground water beneath the plant site as a result of improper storage and disposal of the 'salt cake' associated with [RRA's] plant processes."  (Id. at Ex. DD.)  Delavan further noted that RRA had been turned down for a proposed landfill site to dispose of its salt cake and that it should have applied for a solid waste permit to

dispose of or store its salt cake. (Id.) He cautioned Ferguson, in bold type, that no additional salt cake waste could be added to its current storage areas. (Id.)

In May 1993, "the clean-up of the existing saltcake piles" at RRA remained a key consideration for Alumax. (Id. Ex. W.) Chuck Kucera, Alumax's Director of Environmental Affairs, wrote the Arkansas Industrial Development Commission in January 1994 to support RRA's application for funding. (Id. Ex. AA.) He expressed this concern:

> I've visited RRA on several occasions, evaluated their salt cake crushing and disposal project, and believe that, given the necessary financial resources, they would be able to rectify some past environmental problems, and bring the business back to a healthy financial and environmentally complaint site.
>
> Failing that, I fear that the business will turn into an environmental liability rather than an employment opportunity, and require state funds for remediation, or even result in unproductive legal activities should [RRA's] customers be pulled unwilling into site clean-up activities.

(Id.)

Two years later, Alumax remained concerned about the amount of salt cake stored at RRA. (Id. Ex. CC.) A May 1996 Waste Disposal Site Audit concluded with the caution that "[RRA's] facility has the potential for major environmental AND safety-related liability. With Alumax as a customer, it would increase the chances that Mr. Ferguson could remain in business at least until the salt cake is processed. Otherwise, this facility cannot be recommended." (Id.)

Shapiro did not thermally process scrap metal at its facilities, and began shipping aluminum dross and scrap aluminum to RRA for processing in October 1994. (Doc. 78, no. 10; Doc. 91 no. 159.) The earliest documentation of Shapiro shipping its aluminum scrap

metal to RRA is dated October 24, 1994. (Id.[5]; Doc. 91 Ex. GG.) Shapiro shipped its aluminum dross and scrap to RRA by truck. (Doc. 78, nos. 12and 17.) When a truck carrying the dross and scrap arrived at RRA it was weighed and the material was assigned a lot number and unloaded onto a pad. (Doc. 78 Ex. E at 18, 21.) The truck was weighed again after being unloaded in order that the weight of the material could be determined. (Id. at 18.) The unloaded material was run in the furnace in the order in which it arrived. (Id. at 21, 23.) Each customer's material was kept separate and was not intermingled with any other customer's load. (Doc. 91 Ex. 20 at 36-37.) Flux, a granular combination of equal parts table salt and potash and sometimes with a relatively small percentage of calcium added, was added to the material. (Doc. 78 Ex. E at 33-34.) The flux had a lower melting temperature than the aluminum and was instrumental in separating the aluminum from the rest of the scrap material. (Id. at 31.) The material and flux were heated in the furnace as the furnace rotated. (Id. at 35-36.) The aluminum would melt in the process, at the end of which a tap hole at the bottom of the furnace would be opened and the melted aluminum would run down into molds. (Id. at 36-37, 41.) Once the aluminum-filled mold had cooled, the aluminum would be dumped out of the mold and weighed. (Id. at 42.) The customer would then be notified that its aluminum was ready to be picked up. (Id. at 43, 55.) RRA did not deliver the recovered aluminum to customers. (Id. at 55.) Ferguson testified in his

---

[5]In the cited Statement of Uncontroverted Material Facts Shapiro admits that "[d]ocumentation indicates the earliest date Shapiro shipped scrap or dross to [RRA] was October 24, 1994." Shapiro admits only that its earliest shipment was in October 1994 in response to this same Statement in another Statement of Uncontroverted Material Facts filed a month later. (See Doc. 101 no. 7.) A bill of lading dated October 24, 1994, supports Plaintiffs' factual allegation. (See Doc. 91 Ex. GG.)

deposition that RRA's agreement with its customers was that it never took title to the customers' dross or aluminum.  (Doc. 91 Ex. 20 at 26, 30-31.)

RRA ceased operations in November 1998, and filed for bankruptcy in November 1999.  (Doc. 78 no. 52, Ex. E at 14 and G, Ex. 20 at 16.)  The next year, in October 2000, the EPA began a CERCLA removal action at RRA to excavate and dispose of salt cake and the copper-contaminated soil.  (Doc. 78 Ex. J.)  The primary source of that salt cake was reported to be "from the processes used by [RRA] to recover aluminum from dross."  (Id. at 2.)  The report also included the following description of RRA's operations:

> Aluminum was separated from dross in natural gas fired rotary kilns. Naturally occurring salt minerals, halite (NaCl) and sylvite (KCL),[6] were added to each batch of raw dross to serve as a flux.  The mixture was heated which allowed the molten aluminum to separate from the overlying flux by gravity.  After the aluminum was recovered, the molten flux was tapped out, and as the flux cooled, it solidified into a dry inorganic monolithic solid material referred to as 'salt cake.'  Approximately 100,000 cubic yards of salt cake are currently stored onsite. . . .   The salt cake storage areas are open, which resulted in high salt concentration in both surface runoff and shallow groundwater. . . .

(Id. at 2-3.)  The purpose of the removal action "was to reduce the potential impact of hazardous constituents from Aluminum dross/saltcake human health and the environment." (Doc. 78 Ex. K at 2-1.)  One year later, the removal action was completed.  (Id. Ex. L.)

As noted above, Shapiro was served with the fourth amended complaint in the Wise suit in May 2002 and in the Clark suit in July 2002.  It filed an answer in the Wise suit on July 19 and in the Clark suit on September 24.  (Doc. 91 Exs. 14, 15.)  David Lorenz, the chief financial officer for Shapiro at the time, testified in his deposition that Shapiro did not

---

[6]Halite includes sodium chloride; sylvite includes potassium chloride.  Webster's Third New Int'l Dictionary 1023, 2316 (1961).

investigate when served whether it had insurance coverage applicable to either suit. (Doc. 91 Ex. JJ at 78.) Indeed, when asked about insurance coverage during discovery in the Wise and Clark suits, Shapiro replied that it had no liability insurance applicable to the pertinent claims. (Doc. 78 Ex. D at 50, Ex. M no. 6 and 8, Ex. O no. 14, Ex. 9.)

Before Shapiro was served, Ferguson's deposition had been taken in the Wise suit in November 2001. (Doc. 78 Ex. 20.) An attorney for Shapiro is not listed as being present – understandably – and neither is one for another Corporate Employer defendant, Newco Metals, Inc. ("Newco"), an Indiana corporation. (Id.) Ferguson's video-taped deposition was taken in May 2002. (Id. Ex. 21.) Again, no attorney is listed for Shapiro or Newco. (Id.) Transcontinental accepted Newco's tender of defense on August 5, 2002, reserving the right to withdraw from that representation if any bodily injury or property damage was shown to be expected or intended by Newco or was shown to be arising from the release of pollutants. (Doc. 81 Ex. 14.) At least for the policy period from March 27, 1998, to March 27, 1999, the Transcontinental insurance policy carried by Newco included a Limited Pollution Liability Coverage Endorsement. (Doc. 88 Ex. 11.) This provision provided for coverage for some bodily injury or property damage caused by pollution that would otherwise not be covered pursuant to a pollution exclusion provision.

Ferguson died on June 25, 2003. (Doc. 91 Ex. 22.)

On their attorney's advice, Shapiro joined a defense group in the two suits. (Doc. 78 Ex. KK at 80-81.) On August 15, 2003, Lorenz wrote a check on a Shapiro account for $20,000.00 made payable to the joint defense funding agreement. (Doc. 91 Ex. 16.) According to his deposition testimony, it was probably after writing this check that Lorenz

decided to inform Shapiro's insurance carriers of the Wise and Clark suits.  (Doc. 78 Ex. KK at 75.)  On the other hand, Richard Dobkin, a vice-president of Shapiro, recalls that he decided to pursue insurance coverage after learning from another defendant in the Wise and Clark suits that the insurance carriers for Shapiro were providing a defense for that defendant, Newco.  (Doc. 78 Ex. D at 50.)

Whatever the motivation, Lorenz wrote Associated Insurance Group ("AIG") on August 29, 2003, enclosing copies of the Wise and Clark fourth amended complaints, reporting that Shapiro was insured by CNA[7] and had recently written a $20,000 check to a joint defense fund, and asking AIG to forward the complaints to CNA.  (Doc. 46 Ex. 5.)  Subsequently, AIG sent CNA the complaints on September 10, 2003.  (Doc. 45 Ex. G; Doc. 101 no.  29.)  This letter "did not specify which CNA company or which policies Shapiro was seeking coverage under" for either suit.  (Id. no. 30.)  The letter followed a telephone conversation the day before advising CNA that a claim had been made against Shapiro.  (Doc. 46 Ex. 7.)  The date of loss on the form was September 9, 2003.  (Id.)  The form, apparently completed by a CNA representative, included the following remark: "The caller stated that their [sic] was a lawsuit filed against the insd [sic] aledging [sic] theat [sic] the insured polluted multiple areas of property[.]"  (Id.)

On September 17, Patricia O'Byrne wrote to Lorenz on behalf of one CNA company, Transcontinental, to acknowledge receipt of Shapiro's notice of claim.  (Doc. 91 Ex.13B.)  After summarizing the claims in the Wise and Clark suits and Shapiro's decision to retain a

---

[7]CNA is a service mark.  (Doc. 78 Ex. 10 ¶ 1.)  Several insurance companies, including Transportation and Transcontinental, operate under this mark.  (Id.)

law firm, O'Byrne requested information on eight topics, including the names of all insurance carriers that provided insurance during the period of loss and a description of Shapiro's involvement with RRA.  (Id.)  When Lorenz received this letter he did not respond to it or forward it to anyone else for a response.  (Doc. 91 Ex. JJ at 85.)  He could not explain why Shapiro did not respond to O'Byrne's inquiries.  (Id.)

A response was made on behalf of Shapiro on January 28, 2004.  (Doc. 91 Ex. 13C.) Shapiro's attorney wrote O'Byrne that the relevant policy number was C1034037261 and that the policy was originally issued in 1995 and was renewed for the next three years.  (Id.) Mediation in the Clark suit was set for March 3, 2004; trial was set for April 19.  (Id.)  Trial in the Wise suit was scheduled for June 7, 2004.  (Id.)  Both trial settings were the first.  (Id.) Shapiro had been represented by two law firms, each of which was willing to continue to represent Shapiro after CNA had assumed responsibility for its defense.  (Id.)  It was understood by Shapiro that CNA was also defending Newco in each of the two Arkansas suits.  (Id.)  The letter ended with the request that CNA provide its plan for defending Shapiro on or before February 6.  (Id.)

Having had no reply, Shapiro's attorney again wrote O'Byrne on February 9.  (Doc. 46 Ex. 9.)  He reported that several important deadlines were approaching in the Clark suit, including a deadline of February 25 for the filing of dispositive motions.  (Id.)  The attorney further explained that Shapiro had had to undertake its own defense after CNA failed to respond to its "August 2003" claims.  (Id.)  Additionally, Shapiro expected CNA to offer to settle the Arkansas suits up to its policy limits, to reimburse it for any fees and expenses incurred to date, and to pay any judgment that exceeded its policy limits.  (Id.)

O'Byrne replied to this letter on February 27. (Doc. 91 at Ex. 13D.) The reply listed three insurance companies: Continental, with policy CLP 05189920-95 from October 10, 1994, to June 6, 1995; Transportation, with policies C1 34037261 from June 9, 1995, to October 1, 1999; and Transcontinental, with polices C1 34037261 from October 1, 1999, to October 1, 2001. (Id.) Coverage under any of these policies was declined based on the pollution exclusions in the policies, the "Expected or Intended Exclusion" provisions in the policies, and Shapiro's failure to give notice of the suits "as soon as practicable." (Id.)

In June 2004, the Wise suit was settled, with the exception of the City of Stamps. (Doc. 78 no. 94; Doc. 78 Ex. N.) The settlement agreement included a description of the plaintiffs' claims: "Plaintiffs' claims consist of property damage for their individual properties . . . along with various and sundry health complaints which they relate to their exposure to the RRA plant." (Id.) Shapiro paid Alcoa a total of $15,000.00 for its portion of the settlement and for an indemnity agreement with Alcoa. (Doc. 91 Ex. 19.) The Clark suit was also settled that same month. (Id. Ex. P.) The Clark plaintiffs' claims were described as "various and sundry health complaints, which they relate to their exposure to RRA plant, and some claims for property damage." (Id.)

A few months before the Wise and Clark suits were settled, this action was filed. Continental, Transcontinental, and Transportation seek a declaratory judgment, see 28 U.S.C. § 2201(a), that under seven insurance policies they had neither a duty to defend nor a duty to indemnify Shapiro in the two Arkansas suit. These policies are: policy 61 CLP 05189920-95 issued by Continental for the period from October 10, 1994, to June 9, 1995; policy number C1 34037261 issued by Transportation first for the period from June 9, 1995, to

October 1, 1996, and renewed annually for the next three years; policy number C1 34037261 issued by Transcontinental for the period from October 1, 1999, to October 1, 2000; and policy number C 1034037261 issued by Transcontinental for the period from October 1, 2000, to October 1, 2001.

In its first amended answer and counterclaims, Shapiro seeks a declaratory judgment that there is coverage and also seeks damages under theories of breach of contract (Count II), breach of an implied covenant of good faith and fair dealing (Count III), and vexatious refusal to pay (Count IV).

The *one* Continental policy at issue[8] was issued for the period from October 10, 1994, to October 10, 1995. (Doc. 45 Ex. B.) The declaration page listed a premium of $62,145.00 due at inception and described Shapiro's business as a scrap metal dealer. (Id.) A copy of the declaration page submitted by Continental in support of its motion for partial summary judgment for failure to pay premiums has "CANCELLED" stamped on it, the word "flat" by the line labeled "Date Cancelled," and "$62145" written by "pro rata." (Id.) "Elsewhere" is listed as the reason for the cancellation. (Id.) A "Policy Work Order" was issued on November 14, 1994, for the "flat" cancellation of policy number 05189920 effective October 10, 1994. (Id. Ex. E.) A "Cancellation Summary" issued on November 17 also indicates a "flat" cancellation effective October 10, 1994, of policy CLP 5189920 for the period from October 10, 1994, to October 10, 1995, and a return of a $62,145 premium. (Id. Ex. F.)

---

[8]The parties devote space and time to the question of whether an earlier policy issued by Continental, 61 CLP 05189920-94, effective from October 10, 1993, to October 10, 1994, created a duty to defend or indemnify. This policy apparently cannot be located by any party. This policy was also not pled as a basis for relief.

Lorenz testified in his deposition that he had records for Shapiro's insurance going back only through 1996.  (Id. Ex. C at 63.)  He did not know if Shapiro had paid the premium for the Continental policy, or if it had been cancelled.  (Id. at 58-60, 64.)  An October 28, 1994, letter to Continental from Shapiro's then-insurance agency encloses the original CLP 5189920 policy for flat cancellation.  (Id. Ex. D.)  A copy of this letter also bears the "CANCELLED" stamp with the lines to indicate the return of the premium and the flat cancellation.  (Id.)

Continental moves for partial summary judgment on the grounds that no policy issued by it was in effect for the period from October 10, 1994, to October 10, 1995, the one policy having been cancelled "flat" at the request of Shapiro.  Shapiro counters that, although it cannot refute or confirm Continental's allegations that the one policy was cancelled flat, Continental is not entitled to summary judgment on the preceding policy it issued to Shapiro, policy 61 CLP 05189920-93.  Neither side has submitted a copy of this earlier policy.[9]

As noted above, Transportation issued Shapiro four Commercial General Liability ("CGL") insurance policies.  (Doc. 78 Ex. 10A-10D.)  The policy for the period beginning June 9, 1995, included the following pollution exclusion:

The following exclusion is added to COVERAGES A and B (SECTION I):

This insurance does not apply to:

(1) "Bodily injury," "personal injury," or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

_____

[9]The Court again notes that this earlier policy was not pled in the complaint or in Shapiro's amended answer and counterclaims.  See note 8, above.

. . .

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

(i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor, or subcontractor; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants.

Subparagraphs (a) and (d)(i) do not apply to "bodily injury" or "personal injury" or "property damage" arising out of heat, smoke or fumes from a hostile fire.

(2) Any loss, cost or expense arising out of any:

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; . .

Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes material to be recycled, reconditioned or reclaimed.

(Id.)

This insurance policy also imposed on Shapiro a duty to notify Transportation "as soon as practicable" of an "'occurrence' or an offense which may result in a claim." (Id.) Moreover, "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [Transportation's] consent." (Id.)

The insurance policy for the three periods from October 10, 1996, to October 10, 1997, from October 10, 1997, to October 10, 1998, and from October 10, 1998, to October 10, 1999,[10] included identical exclusions, definitions, and provisions. (Id. Exs. 10B, 10C, 10D.)

Transportation argues in its motion for partial summary judgment that this "absolute pollution exclusion" in each of the four applicable CGL policies relieves it of the duty to defend or the duty to indemnify Shapiro in the Wise and Clark suits. Transportation characterizes these suits as alleging bodily injury or property damage arising out of the alleged release of pollutants. Shapiro, on the other hand, contends in its motion for summary judgment on Counts I and II of its counterclaims, see page 14, above, that the absolute pollution exclusion applies only if Shapiro pollutes the environment by disposing of or discarding any substances that are identified in that exclusion. Moreover, Shapiro is primarily a scrap metal dealer, Transportation knew this and cannot now contend that its policies do not cover claims arising from contact with aluminum scrap.

_____

[10]In the most recent policy, the pollution exclusion provisions is set forth in subparagraph "f" under "Exclusions" rather than in a separate endorsement. The text of the exclusion is the same as in the three earlier CGL policies.

Transcontinental, the provider of the last two insurance policies at issue, moves for summary judgment on the grounds that Shapiro admitted in response to Transcontinental's first request for admissions that under the two policies it issued to Shapiro Transcontinental had no duty to defend or indemnify Shapiro for the claims made in the Wise and Clark suits. Shapiro disagrees.

Transcontinental issued Shapiro CGL policy C1 34037261 effective October 1, 1999, to October 1, 2000, and policy C 1034037261 for the period from October 1, 2000, to October 1, 2001. (Doc. 43 nos. 5, 6.) Each policy provided that:

1. Insuring Agreement

. . .

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "bodily injury" or "property damage" occurs during the policy period.

(Doc. 43 Ex.1A at [649]; Ex. 1B at [720].)

Plaintiffs' First Set of Request for Admissions asked Shapiro to admit that Shapiro contended that Transcontinental should have defended and indemnified it in the Wise and Clark suits under the two policies. (Doc. 43 Ex. 4, nos. 40-51.) Shapiro denied each request. (Id. Ex. 5 nos. 40-51.)

Additionally, Transportation and Transcontinental separately move for summary judgment on the grounds that each was prejudiced by Shapiro's failure to give the required notice when sued; that the absolute pollution exclusion provision precludes coverage; and

that, if there is coverage, there is no duty to reimburse Shapiro for payments voluntarily made before notice was given and no vexatious refusal to pay. Continental renews its arguments in a separate motion for summary judgment.

Standard of Review of Summary Judgment Motions. "Rule 56(c) [of the Federal Rules of Civil Procedure] 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" **Erenberg v. Methodist Hosp.**, 357 F.3d 787, 791 (8th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)) (alteration added). An issue of material fact is genuine if it has a real basis in the record; and, a genuine issue of fact is material if it "might affect the outcome of the suit under the governing law." **Hartnagel v. Norman**, 953 F.2d 394, 395 (8th Cir. 1992) (citations omitted).

The initial burden is on the moving party to clearly establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. See **City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.**, 838 F.2d 268, 273 (8th Cir. 1988). After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. See **Matsushita Elec. Indus. Co. v. Zenith Radio Corp.**, 475 U.S. 574, 586 (1986). "A [party] facing a summary judgment motion cannot 'get to the jury without any significant probative evidence tending to support the complaint[,]'" but must "make a sufficient showing on every essential element of its claim on which it bears the burden of proof." **Buettner v. Arch Coal Sales Co.**, 216 F.3d 707, 718 (8th Cir. 2000) (alterations added) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). And, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could

actually affect the outcome of the lawsuit." **Webb v. Lawrence County**, 144 F.3d 1131, 1135 (8th Cir. 1998).

Consistent with Rule 56(e)'s requirement that "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein[,]" hearsay and hearsay about hearsay is given no effect in considering motions for summary judgment. See **Erickson v. Farmland Indus., Inc.**, 271 F.3d 718, 727 (8th Cir. 2001); **Mays v. Rhodes**, 255 F.3d 644, 648 (8th Cir. 2001); **Cronquist v. City of Minneapolis**, 237 F.3d 920, 927 (8th Cir. 2001). See also **Reynolds v. Land O'Lakes, Inc.**, 112 F.3d 358, 364 (8th Cir. 1997) (noting that inadmissible hearsay statement "standing alone" may not defeat a summary judgment motion). "[A] successful summary judgment defense requires more than argument or re-allegation; [the party] must demonstrate that at trial it may be able to put on admissible evidence proving its allegations." **JRT, Inc. v. TCBY Sys., Inc.**, 52 F.3d 734, 737 (8th Cir. 1995) (alteration added). "'Allegations do not rise to an issue as to a material fact.'" **Herring v. Canada Life Assurance Co.**, 207 F.3d 1026, 1030 (8th cir. 2000) (quoting Marshall v. UNUM Life Ins. Co., 13 F.3d 282, 284 (8th Cir. 1994)).

Additionally, where the unresolved issues are primarily legal, rather than factual, summary judgment is particularly appropriate. See **Adams v. Boy Scouts of America - Chickasaw Council**, 271 F.3d 769, 775 (8th Cir. 2001); **Gordon v. City of Kansas City, Mo.**, 241 F.3d 997, 1002 (8th Cir. 2001).

Continental's Motion for Partial Summary Judgment.  Missouri law is applicable, see

**Capitol Indemn. Corp. v. 1405 Assocs., Inc.**, 340 F.3d 547, 549 (8th Cir. 2003); **St. Paul**

**Fire and Marine Ins. Co. v. Missouri United School Ins. Council**, 98 F.3d 343, 345 (8th

Cir. 1996), and holds that an insurance policy is a contract and is governed by the rules of

contract construction, see **Blair v. Perry County Mut. Ins. Co.**, 118 S.W.3d 605, 606 (Mo.

2003) (en banc).  "Absent an equitable ground, an insurance policy may be cancelled only"

1) by mutual assent of the parties, or 2) under the terms of the contract." **Id.** at 606-07.

The uncontroverted evidence before the Court is that Shapiro requested on October

28, 1994, that Continental cancel its policy that became effective 18 days earlier.  Shapiro

returned the policy to Continental.  Continental returned the $62,145 premium to Shapiro and

cancelled the policy "flat."  "[T]he term 'cancel flat' as used in the insurance industry means

to cancel the policy from its inception date without liability on the part of the insured for

premiums or liability on the part of the insurer for losses." **Golden Eagle Ins. Co. v.**

**Foremost Ins. Co.**, 25 Cal.Rptr.2d 242, 253 (Cal.Ct.App. 1993) (alteration added).  An

insured solicits insurance bids from more than one insurance company and then cancels flat

the policies proffered by the unsuccessful bidders. **Id.**  The notations on Continental's

internal documents indicate that this strategy was followed by Shapiro.  Moreover, the return

by Shapiro of the policy to Continental and Continental's return of the premium to Shapiro

reinforce the conclusion that there is no coverage under that policy for any loss sustained by

Shapiro.  See **Hanks v. Camden Fire Ins. Co.**, 74 S.W.2d 873, 875 (Mo.Ct.App. 1934)

(concluding that argument that insurance policy had been cancelled at time of claimed loss

was successfully supported by insured's acceptance of return of premium).

As previously noted, Continental seeks a declaratory judgment that it had no duty under policy CLP 5189920, effective October 10, 1994, to defend or indemnify Shapiro in the Wise and Clark suits. This policy was cancelled flat; thus, Continental had no liability to Shapiro under that policy. Continental's motion for partial summary judgment will be granted.

Transportation Insurance Company's Motion for Summary Judgment Based on the Absolute Pollution Exclusion and Cross-Motion for Summary Judgment. Transportation argues in its first motion that it had no duty to defend or indemnify based on the absolute pollution exclusion in its policies. In its second motion, it additionally argues that Shapiro's failure to give it notice "as soon as practicable" as required by those policies relieved it of either duty.

Under Missouri law, "'[t]he duty to defend is broader than the duty to indemnify[,]'" **Universal Underwriters Ins. Co. v. Lou Fusz Auto. Network, Inc.**, 401 F.3d 876, 879 (8th Cir. 2005) (quoting McCormack Baron Mgmt. Servs., Inc. v. American Guarantee & Liability Ins. Co., 989 S.W.2d 168, 170 (Mo. 1999) (en banc)) (alterations added), and exists "where there is a potential liability," **id.** "There is a duty to defend allegations within the policy's coverage even if the insurer may not ultimately be obligated to indemnify the insured." **Valentine-Radford, Inc. v. American Motorists Ins. Co.**, 990 S.W.2d 47, 51 (Mo.Ct.App. 1999). "In assessing whether there is a duty to defend, [the Court] must compare 'the language of the policy with the allegations in the petition.'" **Universal Underwriters Ins. Co.**, 401 F.3d at 879 (quoting Auto Club Family Ins. Co. v. Jacobsen, 19 S.W.3d 178, 182 (Mo.Ct.App. 2000)) (alteration added). See also **McCormack Baron**, 989

S.W.2d at 170-71 ("If the complaint merely alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend."); **Royal Ins. Co. of America v. Kirksville College of Osteopathic Medicine**, 191 F.3d 959, 961 (8th Cir. 1999) (citing McCormack Baron).  In doing this comparison, the Court "must give each term its ordinary, lay meaning unless the policy expressly defines a term in a technical manner."  **Universal Underwriters**, 401 F.3d at 880 (citing Farmland Inds. Inc. v. Republic Ins. Co., 941 S.W.2d 505, 508 (Mo. 1997) (en banc)).  If the policy does clearly define a term, the policy definition controls.  **Heringer v. American Family Mut. Ins. Co.**, 140 S.W.3d 100, 103 (Mo.Ct.App. 2004).  If, however, "the language of the policy is ambiguous, it is construed against the insurer."  **Id.** at 102-03.  "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of words used in the contract."  **Id.** at 103.  An ambiguity does not exist merely because "the parties disagree over the interpretation of a contract."  **Missouri Employers Mut. Ins. Co. v. Nichols**, 149 S.W.3d 617, 625 (Mo.Ct.App. 2004).  Additionally, when considering whether a duty to defend exists, "actual facts known or ascertainable at the commencement of the suit may also be considered."  **Superior Equip. Co. v. Maryland Cas. Co.**, 986 S.W.2d 477, 482 (Mo.Ct.App. 1998).

Before the duty to defend may be invoked, however, the insurer must be given notice of the complaint or pleading.  **Trans World Airlines, Inc. v. Associated Aviation Underwriters**, 58 S.W.3d 609, 620 (Mo.Ct.App. 2001).

Shapiro was served with the Wise suit in May 2002 and with the Clark suit in July 2002.  Transportation was notified of those suits at the earliest in September 2003.

Meanwhile, Shapiro had paid money to a joint defense fund and the deposition of the president of RRA – a man designated by Shapiro in the instant case as someone with discoverable information – had been taken twice before his death in June 2003.

A provision in an insurance policy requiring that notice of an occurrence be given to the insurer "as soon as practicable" is valid and enforceable. See **Johnston v. Sweany**, 68 S.W.3d 398, 401 (Mo. 2002) (en banc); **Rocha v. Metropolitan Prop. and Cas. Ins. Co.**, 14 S.W.3d 242, 247 (Mo.Ct.App. 1999); **Dodson v. State Farm Gen. Ins. Co.**, 972 S.W.2d 450, 452 (Mo.Ct.App. 1998). See also **Fireman's Fund Ins. Co. v. ACC Chemical Co.**, 538 N.W.2d 259, 262 (Ia. 1995) (citing an insurance law treatise for the holding that "[t]he policies' requirement of timely notice constitutes a condition precedent to recovery"). The burden of proof of notice "ordinarily" rests on the insured. **Johnston**, 68 S.W.3d at 401. "'Strong public policy interests are protected through the use of notice provisions. For, the insured public will incur additional and unnecessary costs if insurers are forced to pay stale claims, as to which the insurer has not been accorded the opportunity to conduct an investigation while the facts are still fresh.'" **Dodson**, 972 S.W.2d at 452 (quoting Billings v. State Farm Mut. Auto. Ins., 741 S.W.2d 886, 888 (Mo.Ct.App. 1987)). When an insured fails to give the required notice, an insurer may assert that the delay was a material breach of the contract. **Id.** at 453. To prevail on this assertion, the insurance carrier must show that it was prejudiced by the delay. **Id.** Whether the carrier makes this showing is "'an issue of fact to be determined on the particular facts of each case.'" **Id.** (quoting Tresner v. State Farm Ins. Co., 913 S.W.2d 7, 16 (Mo. 1995) (en banc)). "Prejudice to the insurer [is] not

presumed from the mere fact of an insured's delay in giving notice." **Tresner**, 913 S.W.2d at 11 (alteration added).

In the instant case, the Court finds that Ferguson's death was not so prejudicial as to grant Transportation summary judgment on the question of notice. There is no allegation that William Shackelford died before Transportation was given notice of Shapiro being served with the two Arkansas suits. Shackelford worked at RRA from November 1988 until it closed in November 1998. (Doc. 78 Ex. E at 8, 14.) He began work as a furnace helper and over the course of his employment successively became a furnace operator, laboratory technician, assistant plant manager, and plant manager. (Id. at 8-14.) His deposition was taken in this case in October 2004. He was asked in that deposition about RRA's procedures and methods for reclaiming aluminum, its handling of the resulting salt cake waste, and its battles with state and federal agencies and customers about any environmental consequences from its work. Indeed, portions of that deposition are submitted in support of Transportation's claim that the absolute pollution exclusion is applicable to the claims against Shapiro in the two Arkansas suits.

In those two suits, Ferguson's deposition was taken twice. Neither time did an attorney appear specifically on behalf of Newco. Transportation's claim of prejudice from not being able to depose Ferguson on behalf of Shapiro is inconsistent with its apparent ability to defend another insured under the same circumstances.

Additionally, other than RRA's business affairs and smelting operation, topics about which Shackelford was questioned, there is no indication of what information Ferguson had that was applicable to Shapiro alone. See **Hocker Oil Co. v. Barker-Phillips-Jackson, Inc.**,

997 S.W.2d 510, 520 (Mo.Ct.App. 1999) (rejecting claim of prejudice by insurer who had not been forwarded copy of lawsuit but who had received notice of occurrence day after it occurred and had denied coverage; insurer's knowledge of occurrence on which claims were based negated claim of prejudice); **Farm Bureau Town and Country Ins. Co. v. Rogers**, 959 S.W.2d 880, 885 (Mo.Ct.App. 1997) (rejecting insurer's claim of prejudice resulting from five-year delay, during which time defendant in underlying suit had died; insurer had failed to show what decedent could have testified to that other witnesses had not); **Fireman's Fund Ins. Co.**, 538 N.W.2d at 266 (noting that question of prejudice is usually for jury).  Cf. **Dodson**, 972 S.W.2d at 455 (finding that prejudice was established by nine-year-and-eleven-month delay in automobile accident claim; length of delay tipped scales toward prejudice when insurer was unable to locate pertinent records but was able to locate most of essential witnesses).

Transportation also argues that the absolute pollution exclusion in its policies[11] relieves it of the duty to defend or indemnify Shapiro in connection with the two Arkansas suits. Because Transportation is seeking to avoid coverage under the exclusion, "it has the burden of proving the applicability of the exclusion." **Heringer**, 140 S.W.3d at 103. Accord **Trans World Airlines, Inc.**, 58 S.W.3d at 621. "Exclusionary clauses in insurance policies are strictly construed against the insurer." **Casualty Indem. Exch. v. City of Sparta**, 997 S.W.2d 545, 548 (Mo.Ct.App. 1999).

A pollution exclusion clause has been both applied and rejected by the Missouri courts.[12]

---

[11]For a detailed discussion of the evolution of pollution exclusion clauses in insurance policies and the cases considering such clauses, see **Morton Int'l, Inc. v. General Accident Ins. Co.**, 629 A.2d 831, 849-84 (N.J. 1993). The New Jersey Supreme Court notes in that case the seminal standard pollution-exclusion clause was known as exclusion "f" in the standard CGL policy. **Id.** at 850. That court described the impetus for the exclusion:

> Commentators attribute the insurance industry's increased concern about pollution claims to environmental catastrophes that occurred during the 1960's. . . . Other commentators observe that the insurance industry, concerned about public reaction to environmental pollution, desired to clarify and publicize its position that CGL policies did not indemnify knowing polluters.

**Id.** at 850 (alteration added) (interim citations omitted). Once this standard pollution-exclusion clause gained regulatory approval, "it was uniformly adopted as an endorsement to the standard-form CGL policies that were issued to innumerable commercial enterprises[.]" **Id.** at 851 (alteration added). Exclusion "f" was later replaced by the "absolute pollution exclusion" that additionally excluded liability for government-directed cleanup of environmental damages. John N. Ellison Recent Developments in the Law Regarding the "Absolute" and "Total" Policy Exclusions at *21 (2005). The "absolute pollution exclusion," introduced by 1986, omitted a "sudden or accidental" exception present in the earlier pollution exclusion. **Doerr v. Mobil Oil Corp.**, 774 So.2d 119, 126-27 (La. 2000). Accord **Center for Creative Studies v. Aetna Life and Cas. Co.**, 871 F.Supp. 941, 945 n.5 (E.D. Mich. 1994).

[12]The Missouri Supreme Court has not addressed the scope or application of the absolute pollution exclusion. Thus, this Court may consider decisions from the Missouri appellate courts, analogous decisions, "'and any other reliable data tending convincingly to show how the highest court in the state would decide the issue.'" **Hartford Underwriter's Ins. Co. v. Estate of Turks**, 206 F.Supp.2d 968, 976 (E.D. Mo. 2002) (quoting State of Missouri v. City of Glasgow, 152 F.3d

In **Hocker Oil Co.**, 997 S.W.2d at 517-18, the Missouri Court of Appeals found the exclusion did not preclude coverage for property damage caused when a drain plug on a gasoline tank at one of the plaintiff's service stations failed, causing approximately 2,000 gallons of gasoline to be released into the ground, from which it migrated onto land owned by a couple who then sued the plaintiff. After settling with the couple, the plaintiff sought indemnification from its insurer. The insurer denied coverage on the grounds of the applicable policy's pollution exclusion provision. The plaintiffs appealed, arguing that gasoline was its product and not a pollutant. **Id.** at 513. Noting that gasoline had not been identified with particularity as a pollutant in the insurance policy, the appellate court concluded that the plaintiffs "could have reasonably concluded that gasoline was not deemed a pollutant for purposes of the exclusion since it was not specifically identified as such." **Id.** at 518. Moreover, "it would be an oddity for an insurance company to sell a liability policy to a gas station that would specifically exclude that insured's major source of liability." **Id.**

In **Sargent Constr. Co. v. State Auto Ins. Co.**, 23 F.3d 1324 (8th Cir. 1994), the Eighth Circuit Court of Appeals examined whether a solution of muriatic acid used to etch a floor resulting in damage to the contractor's client's chrome fixtures was, under Missouri law, a pollutant within the meaning of the contractor's insurance policy's pollution exclusion provision. The court found that the policy's definition of "pollutant" was ambiguous because a substance could be an "irritant or contaminant" because it had caused a covered injury or because it had the capability of causing a covered injury. **Id.** at 1327. Consequently, the

---

802, 805-06 (8th Cir. 1998)).

court reversed a grant of summary judgment to the insurer and remanded for further proceedings. **Id.**

On the other hand, in **Heringer**, 104 S.W.3d at 103-06, the Missouri Court of Appeals concluded that a standard-language pollution exclusion clause in a CGL policy applied to a bodily injury claim by a woman who was injured when removing lead paint from a client's home. The woman sought damages for her injuries from the client's insurance company, arguing that the pollution exclusion clause was not applicable because a broad application of the pollution exclusion clause would (a) "'reach situations that no one would ever consider pollution'" and (b) render an entire portion of the policy coverage a nullity. **Id.** at 104-05. In **Boulevard Inv't Co.**, 27 S.W.3d at 858, the release of grease and "other waste" into a restaurant's plumbing system, causing extensive property damage, was found to be pollution within the reach of the standard pollution exclusion clause in the restaurant's insurance policy. **Id.** In **Casualty Indem. Exch.**, 997 S.W.2d at 548, the City of Sparta sought indemnification from its insurer for damage caused to dairy cows from sewer sludge sold by the City for use as a fertilizer on a farm adjacent to the dairy farm. The City argued, inter alia, that the absolute pollution exclusion did not apply because sludge was not "'by federal definition'" a hazardous material. **Id.** at 550. The Missouri Court of Appeals rejected the City's position, finding that:

> Inasmuch as (1) the substance at issue in the instant case is sludge, (2) [the plaintiffs in the underlying suit against the City] pled the sludge contained substances toxic to humans and animals, which caused [their] damage, and (3) the Absolute Pollution Exclusion bars coverage for damages arising from exposure to toxic substances, this court holds the Absolute Pollution Exclusion is not ambiguous regarding wether [the plaintiffs'] damage is barred from coverage . . . The Absolute Pollution Exclusion clearly bars coverage.

**Id.** at 551 (alterations added).  In support of this finding, the court quoted the following passage from another case involving the use of fertilizer on an adjacent farm:

> "Although plaintiffs may be correct in their contention that liquid manure is not a 'pollutant' or 'contaminant' when properly applied (and confined) to cropland, we are not persuaded that the characterization of the substance need be rigidly controlled by the time and place of its initial discharge or application.  To the contrary, the subsequent leachate of intentionally deposited waste materials has been held to fall within a similar pollution exclusion[.]"

**Id.** at 552 (quoting Space v. Farm Family Mut. Ins. Co., 652 N.Y.S.2d 357, 358 (1997)) (alteration in original).  See also **Hartford Underwriter's Ins. Co.**, 206 F.Supp.2d at 976 (finding that pollution exclusion applied to claims by child injured by exposure to lead paint; lead paint was specifically listed as pollutant and reference to dictionary established that paint had moved in manner consistent with exclusion); **Cincinnati Ins. Co. v. German St. Vincent Orphan Ass'n, Inc.**, 54 S.W.3d 661, 667 (Mo.Ct.App. 2001) (finding that asbestos-containing dust released into air within building in the process of removing vinyl flooring resulted in contamination and was a pollutant as a reasonable person would understand that term to be).

Applying Missouri law, the Seventh Circuit Court of Appeals noted in **Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.**, 976 F.2d 1037, 1042 (7th Cir. 1992), that "courts have taken a common sense approach when determining the scope of pollution exclusion clauses."  To read the clauses broadly would exclude coverage for claims for bodily injuries by one who slipped on a spilled bottle of Drano or to a swimmer having an allergic reaction to chlorine in a pool.  **Id.** at 1043.  The claims not excluded "[a]ll involve

injuries resulting from everyday activities gone slightly, but not surprisingly, awry." **Id.** at 1044 (alteration added). The complained-of accidental release of polychlorinated biphenyls ("PCBs") by a scrap metal dealer was not one that typically resulted from the processing of scrap metal. **Id.** Under Missouri law, the scope of the pollution exclusion was governed by the expectations of a reasonable policyholder, and such a policyholder would have to expect that the release of PCBs was pollution. **Id.**

In the instant case, the allegations in the Wise and Clark suits that underlie Shapiro's request to its three insurers to defend and indemnify are clearly of bodily injuries and property damage resulting from pollution. This damage did not, as contended by Shapiro, occur in the normal course of its business. It occurred as a result of the processing by RRA of its scrap metal and that of other commercial enterprises for the purpose of reclaiming the aluminum therein. That process concluded with RRA storing the salt cake generated as a result of its smelting operation on bare ground, exposed to the weather, and bordered by two ponds. The allegations were, and the subsequent two million-dollar expenditure by EPA confirmed, that this method of handling salt cake caused environmental damage.[13] Companies who had examined RRA's method of processing scrap metal were concerned about possible environmental damage and litigation as a consequence of the storage of salt cake. A reasonable policyholder would expect this type of damage to be considered pollution within the meaning of the insurance policies' pollution exclusion clauses. Indeed,

---

[13]There is no contention that the "sudden and accidental" exception to the pollution exclusion clause applies in the instant case.

for over a year, Shapiro thought it did not have insurance coverage for the alleged damage.

Additionally, the definition of "pollutant" in the applicable policies includes "alkalis." An alkali is a soluble salt or mixture thereof. <u>Webster's Third New Int'l Dictionary</u> at 54.[14] A reasonable policyholder would have to expect that the seepage of alkalis from huge piles of salt cake, sufficient to kill nearby vegetation, was pollution. <u>See</u> **<u>American Equity Ins. Co. v. Castlemane Farms, Inc.</u>**, 220 F.Supp.2d 809, 814 (S.D. Tex. 2002) (finding that insurer was not liable under policy's pollution exclusion provision for damages caused by the unintentional rupture of salt-water disposal pipeline; there "could be no dispute" that the contents of the salt-water pipeline were liquid waste and "it was reasonable to conclude that salt-water is a 'contaminant' when it is introduced, accidentally, onto property that is not meant to receive it"); **<u>Freedom Gravel Products, Inc. v. Michigan Mut. Ins. Co.</u>**, 819 F.Supp. 275, 282 (W.D. N.Y. 1993) (finding no duty to defend under pollution exclusion clause against claims for contamination of well water from runoff from stockpiled salt; although gavel company did not intend to cause pollution damage, it did expect such runoff as was made clear by series of channels and ditches).

For the foregoing reasons, the Court finds that Transportation owes no duty under the absolute pollution exclusion provisions to defend or indemnify Shapiro for the claims against it in the Wise and Clark suits.

---

[14]"To determine the ordinary meaning of a term, courts consult standard English language dictionaries." **<u>Boulevard Inv't Co. v. Capitol Indem. Corp.</u>**, 27 S.W.3d 856, 858 (Mo.Ct.App. 2000). <u>Accord</u> **<u>Hartford Underwriter's Ins. Co.</u>**, 206 F.Supp.2d at 976.

<u>Transcontinental's Motion for Summary Judgment.</u> Transcontinental, as did the other two plaintiffs, twice moved for summary judgment. The first motion is based on Shapiro's statements in response to Transcontinental's request for admissions denying that it was seeking coverage or arguing that Transcontinental had a duty to defend or indemnify it in the two Arkansas suits. The two polices at issue collectively covered the period from October 10, 1999, to October 10, 2001. As noted above, RRA ceased operations in November 1998.

"'An insured must bring itself within the terms of the policy and must carry the burden of offering substantial evidence that the underlying claim is covered by the policy.'" **Trans World Airlines, Inc.**, 58 S.W.3d at 618-19 (citing <u>American States Ins. Co. v. Vortherms</u>, 5 S.W.3d 538, 543 (Mo.Ct.App. 1999)). The underlying claims in the Arkansas suits were that the plaintiffs suffered bodily injury or property damage as a result of runoff from RRA's salt cake pile. Any salt cake waste from the melting of Shapiro's scrap metal would not have been created after November 1998.

In response to a request for admission, the party to whom the request is directed may specifically deny the matter. Fed.R.Civ.P. 36(a). "A denial shall fairly meet the substance of the requested admission . . ." <u>Id.</u> Shapiro denied that it was seeking coverage from Transcontinental for the two Arkansas suits. This denial is not clearly in error. Transcontinental did not insure Shapiro until 11 months after Shapiro ceased shipping to RRA and RRA ceased operations. This denial together with the lack of any contention that the claimed damage occurred during the policy period adds up to Shapiro failing to carry its burden of showing that the two Transcontinental policies covered the Arkansas suits.

Motions to Strike or Exclude.  Also pending is the motion of Continental Insurance Company to strike immaterial and inadmissible evidence, the motion of Shapiro Sales Company to exclude the opinion testimony of Plaintiffs' expert witness, and the motion of Transportation Insurance Company to strike affidavits and inadmissible evidence.  This Court considered the affidavits and testimony challenged in these three motions only to the extent permitted under the standard of review set forth above.  Each motion will be denied.

## Conclusion

There is no genuine issue of material fact on the question whether Shapiro's CGL policy with Continental was cancelled flat by Shapiro.  It was.  There is no genuine issue of material fact whether the claims asserted in the Wise and Clark suits are within the purview of the pollution exclusion clauses in the CGL policies issued by Transportation to Shapiro. They were.  And, there is no genuine issue of material fact whether Shapiro claims coverage from Transcontinental for those same claims.  It does not.

Accordingly,

**IT IS HEREBY ORDERED** that the motion of Continental Insurance Company for partial summary judgment is **GRANTED** as set forth above.  [Doc. 44]

**IT IS FURTHER ORDERED** that the motion of Transportation Insurance Company for summary judgment based on the absolute pollution exclusion is **GRANTED**.  [Doc. 77]

**IT IS FURTHER ORDERED** that the motion of Transcontinental Insurance Company for summary judgment is **GRANTED**.  [Doc. 100]

**IT IS FURTHER ORDERED** that the cross-motion of Shapiro Sales Company for summary judgment as to Counts I and II of its amended counterclaim is **DENIED**.  [Doc. 81]

**IT IS FURTHER ORDERED** that the motion of Transcontinental for summary judgment based on judicial admissions, the motion of Transportation Insurance Company for summary judgment, the motion of Continental Insurance Company for summary judgment, and the motion of Transcontinental Insurance Company for oral argument are each **DENIED** as moot. [Docs. 42, 91, 92, 101]

**IT IS FINALLY ORDERED** that the motion of Continental Insurance Company to strike immaterial and inadmissible evidence, the motion of Shapiro Sales Company to exclude the opinion testimony of Plaintiffs' expert witness, and the motion of Transportation Insurance Company to strike affidavits and inadmissible evidence are each **DENIED**. [Docs. 53, 60, and 86]

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of September, 2005.